64 P.3d 278

STATE of Hawai'i, Plaintiff–Appellee,

v.

Martin V. CABASAG, also known as "JoJo", Defendant–Appellant.

No. 24538.

Intermediate Court of Appeals of Hawai'i.

Jan. 27, 2003.

Joyce Matsumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Martin V. Cabasag, also known as "Jojo" (Cabasag), appeals from the August 27, 2001 Judgment, upon a jury's verdict, convicting him of the included offense of Robbery in the Second Degree, Hawai'i Revised Statutes (HRS) § 708–841(1)(a) (1993), and sentencing him to incarceration for ten years, a mandatory minimum of eight years, and to pay restitution of $120. We affirm.

## BACKGROUND

On August 3, 2000, a complaint charged Cabasag with the offense of Robbery in the First Degree, HRS § 708–840(1)(b)(i). The first trial in February of 2000 resulted in a hung jury and a mistrial was declared. The second jury trial commenced on April 30, 2001. Judge Marie N. Milks presided.

## POINT ON APPEAL

Although Cabasag did not request such an instruction, Cabasag contends that "the trial evidence supported an instruction on self[-]defense for the lesser offense of Robbery in the Second Degree" and that plain error occurred when the trial court failed to instruct the jury on self-defense.

## RELEVANT STATUTES

HRS § 708–840 (1993 and Supp.2001) states, in relevant part, as follows:

(1) A person commits the offense of robbery in the first degree if, in the course of committing theft:

. . . .

(b) The person is armed with a dangerous instrument and:

(i) The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance; or

. . . .

(2) As used in this section, "dangerous instrument" means any firearm, whether loaded or not, and whether operable or not, or other weapon, device, instrument,

material, or substance, whether animate or inanimate, which in the manner it is used or threatened to be used is capable of producing death or serious bodily injury.

(3) Robbery in the first degree is a class A felony.

HRS § 708–841 (1993) states, in relevant part, as follows:

(1) A person commits the offense of robbery in the second degree if, in the course of committing theft:

(a) The person uses force against the person of anyone present with the intent to overcome that person's physical resistance or physical power of resistance;

. . . .

(2) Robbery in the second degree is a class B felony.

HRS § 708–830(1) (1993) states, in relevant part, as follows: "A person commits theft if the person does any of the following: . . . Obtains or exerts unauthorized control over property. A person obtains, or exerts control over, the property of another with intent to deprive the other of the property."

HRS § 703–304(1) (1993) states, in relevant part, as follows: "[T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion."

HRS § 703–300 (1993) states, in relevant part, that " 'Believes' means reasonably believes."

### THE TRIAL

Lori Ann Santiago (Santiago) testified that, at about ten o'clock on the evening of June 7, 2000, she and her boyfriend, Artienda, and her sister-in-law, Roberta Souza (Souza),[1] were in the parking lot of the Kaumakapili Church. Souza's girlfriend, Rebecca, was in a nearby van. Souza was seeking the use of Santiago's VISA card to effect repayment of the $90 Santiago owed Souza. Although the VISA card was in the house,

Santiago told Souza that Artienda "took it." While Santiago and Artienda were walking away, Souza was following and yelling. Rebecca drove the van near the three people. Another person was in the van. A white car then drove near and Cabasag jumped out from its passenger side. Without saying anything, Cabasag "started [to] front-kick" Artienda. Santiago went to a pay phone at O.K. Grocery on Palama Street and called 911. At this time, Souza and Cabasag were hitting Artienda, "kicking and punching" him. Souza was right next to Cabasag. Souza "was patting [Artienda] down. Checking his pockets." Souza took a wallet out of Artienda's back pants pocket. Cabasag re-entered the white car and its driver drove it away. Souza "jumped in the van and then drove off."

Artienda testified, in relevant part, as follows:

Q After [Cabasag] started kicking and punching you, what did you do?

A I tried to fight back. But then he keep, the gun, he got a gun. So I cannot do anything.

. . . .

Q When this was happening, what was Roberta Souza doing?

A Roberta Souza is still behind me. [Cabasag] just keep kicking me. Souza . . . was holding my shirt in behind.

. . . .

Q Did [Cabasag] do anything other than hit you and kick you and point the gun at you?

A Yes, he just got my cigarette pack in my pocket, front pocket. And as soon as he pick up the cigarettes, pack of cigarettes, he dropped behind me, take my wallet.

. . . .

Q What was taken from you?

A Taken my wallet and my ID and picture of my daughter and $120.

. . . .

---

1. The sister of Roberta Souza is married to the brother of Lori Ann Santiago.

Q  So you are saying there was no arguing between you and [Souza] about a Visa card?

A  No, nothing.  I don't know what Visa you are talking about.  I don't know nothing.

. . . .

Q  When [Cabasag] got out, though, didn't he say something like "Leave my auntie alone, I told you not to touch my auntie"?

A  No, he did not say nothing.  He just come out and started beating me up.

Cabasag testified, in relevant part, as follows:

A  Well, as we pass Kaumakapili Church, right by the corner of Palama, I saw my auntie in the parking lot.  And seems to me, that looks to me she is kind of arguing with somebody, which is a boyfriend.  That's when I told my friend Sixto [Unciano], who is driving the car, "We'll go check it out.  Can you turn back."

Q  . . . You said auntie, do you know her name?

A  Lori [Santiago].  I call her Auntie Lori.

Q  Why?  Is she really your auntie?

A  Not really my auntie.  But out of respect, I call her auntie.

. . . .

Q  What happened when Sixto drove into the parking lot?

A  He went stop right next to my auntie's boyfriend.  And I get out and start walking toward him and telling him something about stay away from my auntie.  And he was telling her about "what, what, what shall I do."  That's when I look, "what, what, shall I do."  He kind of had a fighting stand against me, like he was trying to fight, whatever I said or anything.  It kind of agitate me he was saying was willing, what you going to do.  So he like try for swing.  But I catch him.  I was right there kicking in stomach.  Yes, I catch him right there.

Q  Was there anyone else?  You said this guy [Artienda] was there. Was there anyone else that was in that area right near the trash bin?

A  Yes.  I saw him.  He was arguing. Arguing with somebody, like a butch, like a tomboy, like a boy-looking girl.  They was arguing about a credit card, or money that he owe her, or something like that.

. . . .

Q  What happened?  What type of stuff was happening during the fight or whatever?

A  Well, I kicked him.  And I punched him several times.  And he tried to block it.  And that's about it.  And then my auntie came right behind me and say something, "Jojo, stop, that's enough."  So I looked back and kind of smiled at her.  And I stopped.  And that's when the—oh, the tomboy girl was like frisking the guy or something like that, like, "give me the money" or "give me the credit card".  That's when I started backing up.

. . . .

Q  You said when you came out you actually spoke to [Artienda]; is that correct?

A  Correct.

Q  But you hit him right away; right?

A  I said something first.

Q  After you said something, you hit him right away?

. . . .

A  Yes.

Q  In fact, he never hit you; isn't that correct?

A  Never had a chance.

. . . .

Q  Now, you said you just went there and got into this fight; isn't that correct?

A  Yes.

Q  And you never pulled out a gun; isn't that correct?

A  Correct.

Q  And you never stole anything from Fernando Artienda; isn't that correct?

A  Yes.

Q  Before you left this scene with your friend Sixto, you knew the police were coming; didn't you?

A  Yes.

In his closing argument, defense counsel stated, in relevant part, as follows:

The evidence you heard in this case clearly shows there was no robbery. That [Cabasag] is not guilty of robbery in the first degree, robbery in the second degree, or even of a theft.

. . . .

Prosecution has been making arguments about whether this was a setup for this or that. We would propose what is happening is that [Souza] was demanding this money from [Santiago], could not get it from [Santiago], so [Souza] said [Souza] goes to [Artienda] and starts hassling him for this card. Later on, when [Cabasag] comes up and starts fighting or hitting [Artienda], [Artienda] is getting the worst of it. He can't even fight back in this fight. He is getting punched out, beaten up. Then everyone leaves, and the police come up. So [Artienda] is mad at [Cabasag]. So he is making up this whole story about there being a gun and a robbery. . . .

. . . .

[Santiago] said there was an argument going on between [Artienda] and [Souza]. Driving by, that is what [Cabasag] sees, and tells Sixto: Let's turn around and go back there.

So [Cabasag] goes back and approaches [Artienda]. And he says to him: I told you to leave my auntie alone.

And [Artienda] says something back to him. No one else hears it. But the two of them at that point are by themselves. The car is going. Other people are further away. [Artienda] says something back to [Cabasag]. [Cabasag] gets mad and starts hitting on [Artienda]. That part is indisputable. [Cabasag] hit [Artienda].

But hitting him, use of force, is not what we are charged with here. That is not what this case is about. This case is about was there a robbery, was there a theft. . . .

It does not make any sense at all. This wasn't some setup regarding [Souza]. [Souza] was on her own, . . . [Cabasag] came up, and [Cabasag] got out of hand and started beating up on [Artienda]. But that is all it was. It wasn't a theft. It wasn't a robbery. There is not a shred of

evidence for that, except what [Artienda] claims happened.

. . . .

The prosecution said we know for sure [Cabasag] used force. Yes, that is admitted. [Cabasag] got out and, as he said, had a few quick words with this guy [Artienda] and then went at him. [Artienda] never had a chance to hit him back is what [Cabasag] said. Not because there was a gun—because no one saw a gun—but [Cabasag] got the better of him in the first few punches. And that was the use of force. It had nothing to do with a theft, nothing to do with a robbery.

## DISCUSSION

The jury was instructed regarding the charged offense of Robbery in the First Degree described in HRS § 708–840(1)(b)(i). The relevant part of the allegation was that, while in the course of committing theft from Artienda, Cabasag was armed with a dangerous instrument and used force. The jury also was instructed regarding the included offense of Robbery in the Second Degree. The relevant part of this alternate allegation was that, while in the course of committing theft from Artienda, Cabasag used force but was not armed with a dangerous instrument. The jury also was instructed regarding the included offense of Theft in the Second Degree. This alternate allegation was that Cabasag obtained or exerted unauthorized control over Artienda's property with intent to deprive Artienda of the property.

The jury also was instructed that

[a] defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

. . . .

Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense with intent to

promote or facilitate the offense, he is an accomplice to the commission of the offense.

Cabasag now argues that

an instruction on self-defense ... would have permitted the jury to find that the use of force by [Cabasag] toward [Artienda] was justified. Such justification would have prevented the jury from convicting [Cabasag] of Robbery in the Second Degree as it would not have been able to conclude that [Cabasag] used unlawful force to effect a theft.

In other words, Cabasag contends that when person A uses lawful protective force upon person B to protect person A from the use of unlawful force by person B, person A may use person A's lawful protective force to commit a theft from, or to be an accomplice to person C's theft from, person B and not be guilty of Robbery in the Second Degree. We disagree.

As noted above, HRS § 708–841(1)(a) states that "[a] person commits the offense of robbery in the second degree if, in the course of committing theft: ... [t]he person uses force against the person of anyone present with the intent to overcome that person's physical resistance or physical power of resistance[.]" This statute does not differentiate between lawful/justifiable force and unlawful/unjustifiable force. When person A uses "force" to commit a theft from person B, person A commits a robbery. Similarly, when person A uses "force" to facilitate person C's theft from person B, person A is committing robbery as an accomplice. In either situation, the fact that the force initially used by person A was being used to protect person A from the use of unlawful force by person B is not a defense to the charge of Robbery in the Second Degree.

In this case, considering (1) the fact that Cabasag was not charged with assault; (2) Cabasag's testimony; (3) the precedent that the offense of assault is not included within the offense of Robbery in the First Degree described in HRS § 708–840(1)(b)(i), *State v. Arlt*, 9 Haw.App. 263, 268, 833 P.2d 902, 905 (1992); and (4) defense counsel's closing argument, it is clear why defense counsel did not request a self-defense instruction and

why the court did not give one. Realizing that Cabasag was not charged with, and could not be convicted of, assault as an included offense, defense counsel reasonably decided to admit the assault while denying Cabasag's involvement with a theft, if any. As noted by defense counsel in his closing argument, "[b]ut hitting him, use of force, is not what we are charged with here. That is not what this case is about. This case is about was there a robbery, was there a theft."

## CONCLUSION

Accordingly, the August 27, 2001 Judgment is affirmed.